IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CARLA DOE, | § | |
| | § | |
| Plaintiff, | § | CIVIL CASE NO. |
| | § | |
| v. | § | |
| | § | _____ |
| CASTLEWOOD TREATMENT CENTER, | § | |
| LLC d/b/a ALSANA, and BRITTNEY | § | **JURY TRIAL DEMANDED** |
| GIBBS, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Carla Doe[1], ("Plaintiff"), hereby sues Defendants, Castlewood Treatment Center, LLC d/b/a Alsana ("Castlewood") and Brittney Gibbs ("Gibbs"), and alleges as follows:

## Introduction

1.     This is an action for substantial and irreparable physical, emotional, and psychological harm that Gibbs – and her employer, Castlewood - perpetrated on Plaintiff during the course of what was to have been life-saving treatment for an eating disorder. It is predicated on theories of negligent hiring, supervision, and training, negligent and intentional infliction of emotional distress, negligence, and fraud by non-disclosure.

---

[1] Because mental illness and substance use disorders remain subject to pervasive stigma, Plaintiff has legitimate concerns about publicly disclosing her identity. For that reason, Plaintiff has chosen to file this action pseudonymously, using the fictitious name "Carla Doe." The identity of Plaintiff will be fully disclosed to Defendants and to the Court, so long as such identifying information is not released into the public record. Plaintiff's motion to proceed under a pseudonym has been filed.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because Castlewood was incorporated in the State of Missouri and conducts business in this district. In addition, a substantial part of the events giving rise to Plaintiff's claims occurred in St. Louis County, Missouri.

4.      Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claim for relief arose in St. Louis County.

## PARTIES

5.      Plaintiff is, and at all times material to this Complaint, was a citizen of the State of Washington.

6.      Gibbs is, and, at all times material to this Complaint, was a citizen of Missouri. She may be served with process at her home address:  229 Presswick Lane, St. Louis, Missouri 63303. Plaintiff's counsel has requested Biggs' counsel to accept service through a Waiver of Service.

7.      Castlewood is, and, at all times material to this Complaint, was a limited liability company organized and existing under the laws of Missouri with its principal place of business in Ventura County, California. Castlewood is not a publicly traded company, and at this time, its members cannot be definitively identified. Plaintiff's counsel sent a written request to Castlewood's attorneys asking them to identify the name and citizenship of Castlewood's members. Castlewood's attorneys did not respond to this request.

8.     Plaintiff's attorney conducted an online search to determine the members of Castlewood. That search included, *inter alia*, the Secretary of State records in every state in which Castlewood conducts business. Plaintiff's counsel also researched a number of private equity focused websites for that information, including, but not limited to: Bloomberg, Pitchbook, PE Hub, Dun & Bradstreet, upcounsel, and preqin. In addition, Plaintiff's counsel searched prior lawsuits in which Castlewood was or is a party and spoke with other attorneys who had been involved with Castlewood litigation in the past. Plaintiff's counsel has in the past represented joint venture capital entities and private equity companies. Plaintiff's counsel requested assistance from those entities to determine whether they could ascertain the identity of Castlewood's members. However, those entities likewise did not have success.

9.     The entity[2] which acquired Castlewood in January of 2017 also later acquired an entity known as "Castlewood West, LLC" in California. Castlewood West's principal place of business is also in Ventura County, California. The business conducted by Castlewood and Castlewood West are the same.

10.     In a contract between Castlewood West and the County of Alameda, California Castlewood West represents that, "Castlewood West, LLC (Castlewood West) dba Aslana [*sic.*] ... provide(s) intensive outpatient treatment (IOT), partial hospitalization (PHP), and residential treatment specifically tailored to the needs of adolescents and adults with serious eating disorders (EDs). Clients referred to Castlewood West will be placed in their residential treatment center located in Pacific Grove, CA." This treatment is identical to the treatment provided by Castlewood.

---

[2] This entity is Riverside Partners, LLP d/b/a The Riverside Company ("Riverside"). Although Riverside is not named as a party in the instant case, its ownership of Castlewood and Castlewood West is material to the issue of jurisdiction and the element of intent in some of the claims plead against Castlewood.

11.     The members of Castlewood West are disclosed in corporate documents filed with the California Secretary of State. The members of California West are as follows:

### Castlewood West, LLC. Members

| Name | Designation | State |
|---|---|---|
| | | |
| Michael Eblin | Senior Operating Partner | Ohio |
| Loren Schlachet | Managing Partner | Florida |
| Gayle Devin | CEO | Illinois |
| Robyn Walsh | President – ABI Document Support Service | Connecticut |
| Peter Zucker | Board Member Exec. Chair of Board | California |

12.     Even though the members of Castlewood are not disclosed in public filings, on July 10, 2019, Castlewood filed a Change of Registered Agent with the Missouri Secretary of State. Castlewood's representative on this document was John McKernan. McKernan was previously listed as a member of Castlewood West, LLC. A number of websites also list Castlewood's principal place of business in Thousand Oaks, Ventura County, California at the exact address listed for Castlewood West.

13.     Further, when a patient is accepted into one of the Castlewood entities, she is told that they could go to "Castlewood West" or "Castlewood East" depending on their location, their desires and whether their insurance is in network for the entities within those regions. In addition, Castlewood conducts "virtual treatment" utilizing a team of employees from various Castlewood locations. These employees are interchangeably employed by Castlewood and Castlewood West.

14.     Riverside, the owner of Castlewood and Castlewood West has represented that those two entities are identical. To this end, on June 11, 2018, Riverside issued a press release stating that it had acquired "La Ventana Treatment Programs, a California based

provider of eating disorder programs, as an add-on for is Castlewood platform." In said press release, Riverside managing partner, Loren Schlachet stated, "This addition establishes Castlewood as one of the largest providers of eating disorder treatment in California."

15.    On June 8, 2018, "Alsana" [even though it was not yet in existence] announced that, "Alsana Treatment Centers, a leading provider of eating disorder treatment, currently operating in three states in the U.S. has today announced the acquisition of the eating disorder assets of La Ventana Treatment Programs." Since Castlewood West and Castlewood treat themselves as one entity, for the purposes of jurisdiction and other issues in the case at bar, so too should the Court treat them as one.

16.    Based upon:

    (a) the undersigned's thorough investigation into this matter;

    (b) the fact that Castlewood and Castlewood West share a principal place of business;

    (c) the fact that the two entities share a CEO;

    (d) patients are assigned to a Castlewood entity depending on their location, preference and insurance requirements;

    (e) Castlewood/Alsana and Castlewood West in public representations treat themselves as one entity, and;

    (f) the two entities provide identical services.

    Plaintiff alleges, upon information and belief, that the members of Castlewood and their respective citizenship are the same as Castlewood West set forth in Paragraph 11.[3]

---

[3] The Eighth Circuit has not yet ruled on whether a plaintiff should be allowed to plead jurisdictional allegations on information and belief. There is a split in the Circuit Courts on this issue. However, Plaintiff submits that the evolving caselaw is to permit a plaintiff to plead jurisdictional allegations on information

Upon information and belief, none of the members of Castlewood are citizens of the State of Washington, the state in which Plaintiff has established her citizenship and as such, complete diversity of citizenship exists.

17.     Further, when Castlewood files its answer in this matter, it is required to file Form MOED 0001 – Disclosure of Organizational Interests. Section 2 of said form requires Castlewood to disclose the names and citizenship of its members.

18.     Plaintiff's counsel sent a Waiver of Service to counsel for Castlewood. In the event that Castlewood's counsel does not waive service, Castlewood may be served with a copy of this Complaint by and through its registered agent, *to wit*: CT Corporation, 120 South Central Avenue, Suite 400, St. Louis, Missouri 63105.

## **GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

19.     Plaintiff is a loving wife, mother and daughter. Plaintiff's husband proudly served in the United States military both domestically and abroad. And yet, Plaintiff also suffers and for approximately seventeen (17) years prior to her admission to Castlewood, has suffered from one or more types of eating disorders as defined by the Diagnostic and Statistical Manual Fifth Edition ("DSM-V") and various co-occurring conditions.[4] As part of her efforts to recover from this deadly mental illness, Plaintiff sought treatment at Castlewood.

20.     Upon her arrival at Castlewood on May 14, 2021, when Plaintiff got out of a transportation car she was instantly overwhelmed with the smell of sewage, and noticed

---

and belief after conducting a due diligence investigation. *See, e.g., Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1087 (9th Cir. 2014) ("plaintiff should be permitted to plead jurisdictional allegations ... on information and belief and without affirmatively asserting specific details"); *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99 (3d Cir. 2015) ("[d]epriving a party of a federal forum simply because it cannot identify all of the members of an unincorporated association is not a rational screening mechanism").

[4] Eating disorders are life-threatening illnesses that afflict an estimated 29 million Americans and are the third most common chronic illness among adolescents.

exposed pipes and water being drained into the yard of the property. Plaintiff was greeted by staff members who then took her belongings to search and lead her to the nursing station to begin her admission process.

21.    Plaintiff was given a journal and a water bottle filled with water from their water coolers. Plaintiff was told not to use the tap water because it was not potable and there were pipe issues.

22.    A Castlewood employee told Plaintiff that her primary therapist was a male named Jason and a dietician female named Hollie. Plaintiff expressed that she would prefer not to have a male therapist.  Plaintiff was not comfortable working behind closed doors with a male because of past trauma history with men.

23.    The following day after breakfast, Plaintiff was visibly upset and crying because she was missing her two young children (who were 6 and 1 years old at that time), her husband, and her support system in Washington.

24.    Gibbs approached Plaintiff asking if she wanted to talk. Plaintiff initially told her no. Approximately twenty (20) minutes later, Gibbs again approached Plaintiff and asked if Plaintiff was sure she did not want to talk.

25.    Gibbs obviously saw how vulnerable Plaintiff was. This time, Plaintiff said yes. Gibbs, who was still in training and was not a licensed therapist, took Plaintiff to the basement of the house. Plaintiff told Gibbs that she missed her children and husband. Plaintiff continued to express her struggles, anxiety and depression. Gibbs then asked Plaintiff, "who hurt you?"

26.    Plaintiff told Gibbs that she had experienced trauma as a child. Plaintiff then expressed her concern being assigned a male therapist and expressed that her trauma history was her reason for the request to switch to a female therapist. Gibbs assured

Plaintiff that was a reasonable request that encouraged her to ask that Gibbs be assigned to work with her.

27.     Gibbs represented that she had her PLPC and had 8 years of experience working with trauma in therapy. Gibbs further stated while she did not yet have any clinical experience with eating disorders, she had suffered from her own, including during the pregnancy of her daughter. Gibbs represented that she was now recovered so she understood Plaintiff's eating disorder and what it means to be a mom.

28.     Based on Gibbs' representations, Plaintiff believed she had found a professional who had real life knowledge of the issues with which Plaintiff struggled and was filled with hope.

29.     On Monday, May 17, 2021, Castlewood asked Plaintiff to meet with the male therapist, to whom she had been originally assigned. Plaintiff relented but when she met with the therapist, Plaintiff expressed to him that she didn't feel comfortable working one-on-one with him. It was suggested that Gibbs could be on her therapist team if the caseloads allowed for it.

30.     On Tuesday, May 18, 2021, Anastasia Theisen, the lead therapist at Castlewood's Hawthorne location contacted Plaintiff via email to communicate Castlewood's process when considering a therapist switch. Theisen stated that Gibbs was still in training so she recommended that the male therapist and Gibbs work jointly with Plaintiff.

31.     Plaintiff initially reluctantly agreed to this arrangement but after discussing this plan with her husband, Plaintiff wrote to Theisen and stated her belief that working with a male therapist in any sense would compromise her recovery. Theisen later told Plaintiff that she could work solely with Gibbs. Theisen did not offer any other female therapists.

32.     Plaintiff then began sessions with Gibbs. From the start, Gibbs focused on Plaintiff's past trauma.  Gibbs attempted to relate to Plaintiff's experiences by stating that she had been traumatized as a child. Gibbs then began to plant the seeds aimed at  driving a wedge between Plaintiff and her husband. She began by questioning Plaintiff about her relationship with her spouse. When Plaintiff stated that her husband gave her love and unconditional support and that she didn't deserve it, Gibbs asked Plaintiff if her husband made her believe she wasn't worthy of that love. When Plaintiff responded no, Gibbs asked if Plaintiff was sure because Gibbs stated that Plaintiff developed that belief from someone.

33.     Gibbs represented that she could work Plaintiff through her trauma but she wasn't going to follow "original modalities'" because she had a "unique approach" to trauma therapy. Gibbs' "unique approach" was based upon her need to address her own trauma by transferring the darkness and toxicity that she harbors inside herself to Castlewood patients.  In the case of Plaintiff, this twisted and damaging practice manifested itself in a manipulative scheme intended to disrupt and, ultimately, destroy Plaintiff's relationship with her husband and her children.

34.     During the first family session, Plaintiff's husband expressed his desire that Gibbs be on camera during the session. Gibbs later told Plaintiff that she thought Plaintiff's husband was a narcissist. Plaintiff told Gibbs that could not be true because her husband loved her too much. Gibbs replied by questioning whether what he actually loved was having power over Plaintiff when and because she was sick.

35.     Gibbs commented that Plaintiff's body language seemed guarded during the Zoom session. After each successive session with Plaintiff's husband, Gibbs focused on the "signs" she saw proving he was a narcissist.

36.     During Gibbs individual sessions with Plaintiff, on many occasions Gibbs talked about her own alleged personal struggles in life as a means to continue to cement the trust she was deluding Plaintiff into believing she shared with Gibbs.

37.     On May 31, 2021, Plaintiff received an unexpected call telling her that, after a lengthy battle with kidney disease, her best friend, Kayla Gray would probably not make it through the night. When Plaintiff received this call, she dropped to her knees in tears in the middle of the living room of Castlewood's Hawthorne house. Plaintiff then frantically looked for plane tickets to fly home to be able to be by her friend's bedside in her last moments.

38.     Plaintiff had other friends who were at the hospital who confided that even if Plaintiff were to be able to find an available flight, she would not make it in time. Her friends convinced Plaintiff that she was right where Kayla would want her to be, getting the helped she needed. Plaintiff was able to say her goodbyes to her best friend over Facetime with her other friends present. Very shortly thereafter, her best friend passed away.

39.     In the following days of Plaintiff's severe grief, Castlewood provided very little, if any support. On the morning of June 1, 2021, Plaintiff asked if she could have an individual counseling session before attending a scheduled group session.  Plaintiff was told she had to address this request with leadership. And so Plaintiff expressed her wishes to meet with her therapist to Anastasia Theisen.

40.     Theisen told Plaintiff  that Castlewood was not equipped to handle grief and that Plaintiff could journal about it but Plaintiff needed to go to group and participate in family therapy. Plaintiff told Theisen that her statement made Plaintiff feel like a mere number in their system and not like a real person. Further, Castlewood did not even bring in a

grief counselor to help Plaintiff and did not enact any security measures so that Plaintiff would not self-harm.

41.     Instead, Castlewood continued to unleash Gibbs on Plaintiff without any supervision. The following day, Gibbs had a session with Plaintiff. After that session, Plaintiff was even more emotionally distressed, still malnourished, and not thinking rationally.  Since Castlewood has little or no security or safety measures in place, Plaintiff was allowed to walk out Castlewood's front door, down a long driveway to a pond, and cross over to a field where there was a big tree that had fallen. Plaintiff wrapped her tank top around her neck and started to hang herself from one of the tall branches sticking out from the tree. Plaintiff's tank top ripped ending her attempt to take her own life. As a result, Plaintiff sat down on a tree log in great despair, crying for over one hour.

42.     After over an hour had gone by, the nurses station called Plaintiff asking where she was. Plaintiff told them she was at the pond. Instead of immediately sending an employee to come to Plaintiff's aid, the Castlewood employee stated that if Plaintiff did not return immediately, they were going to call the police.

43.     Upon returning to the house, a nurse saw the red marks on Plaintiff's neck. Castlewood called 911, an ambulance arrived and took her to Mercy Hospital in St. Louis. The following day, Plaintiff explained to the attending doctor that she was in deep mourning because of her friend while trying to recover from her eating disorder and as such, she impulsively acted out.  The doctor at Mercy Hospital, not understanding the nightmare that is Castlewood, cleared Plaintiff to return to Castlewood.

44.     Upon returning to Castlewood, Plaintiff was forced to sign an agreement that required her to sleep in a community space on a couch.

45.     Gibbs' manipulation of Plaintiff renewed with greater fervor. Gibbs required Plaintiff to read her "Trauma Timeline" in an individual session and then a group session she was attempting to conduct. Even though Plaintiff was sweating and insisting how uncomfortable she was, Gibbs required her to continue. After Plaintiff struggled through this group meeting, she was allowed to go to a couch in the basement by herself and cry for three (3) hours.

46.     During almost every session, Gibbs had Plaintiff talk very little about her eating disorder. Instead, Gibbs asserted that her issues were not about food. Gibbs instead opined that Plaintiff's eating disorder was merely a symptom of her unhappiness in life and marriage with her husband.  Gibbs continued to direct the sessions to Plaintiff's marriage. This allowed Gibbs to manifest imaginary red flags she saw in Plaintiff's marriage.  The more Gibbs talked about the red flags that she concocted, the more concerned Plaintiff became about the stability and toxicity of her marriage.

47.     Gibbs continue to tell Plaintiff that she was being manipulated by her husband and that was why Plaintiff didn't see what Gibbs saw. When Plaintiff's husband requested another therapist to lead their family sessions, Gibbs stated that her husband felt threatened by what Gibbs was "helping" Plaintiff realize about her marriage. She even went so far as to say that Plaintiff was not obligated to continue with family therapy.

48.     Gibbs continued her insidious scheme to hurt Plaintiff and Plaintiff's family saying repeatedly that Plaintiff was being manipulated by her husband, that she wasn't seeing her own worth, that Plaintiff's husband wanted her to remain sick, that Plaintiff's husband wanted to take her kids from her, and that Plaintiff's husband had all these terrible intentions that Plaintiff could not see because he was a narcissist who was playing Plaintiff.

49.     Gibbs constantly reminded Plaintiff that it was common for victims to not see their own abuse at the hands of a narcissist and that Plaintiff would wake up after she left him.

50.     Gibbs told Plaintiff she needed to be strategic so that her husband wouldn't have a chance to manipulate her again. Gibbs consistently made references to how Plaintiff's husband was just a repeat of the trauma she had experienced as a child, that Plaintiff was recreating her abuse with him and if Plaintiff stayed with him, she would never truly heal or recover from her eating disorder.

51.     Gibbs even went so far as to utilize Plaintiff's children against her. Gibbs stated that if she continued to allow her husband to recreate this abuse, Plaintiff's children would never be happy if Plaintiff was with her husband.

52.     Gibbs told Plaintiff that if she did not leave her husband and secure  sole custody of her kids Plaintiff would die of her eating disorder or Plaintiff's husband would control her and keep her sick forever. Gibbs pulled threads and pieces of Plaintiff's life that Plaintiff had entrusted to Gibbs. Plaintiff was so vulnerable and honest with Gibbs, and she used that to manipulate Plaintiff's life like she was Gibbs' pawn in a game of chess.

53.     Plaintiff's interactions with Castlewood continued to deteriorate. On June 15, 2021 Plaintiff was taken to the emergency room by a Castlewood staff member for pelvic pain and bleeding that had been on-going for 14 days. A Castlewood employee dropped her off at the ER and immediately left. Plaintiff sat alone in the emergency room for approximately five (5) hours before she was seen. Plaintiff missed over two weeks of programming because of the severe pelvic pain she was experiencing.

54.     Castlewood told Plaintiff she could extend her stay into August to make up for time missed while she was physically ill so they did not need to "worry about discharge planning yet."

55.     Sessions with Gibbs became more coaching clinics on how to effectively leave her husband. Gibbs stated that Plaintiff needed to consult a lawyer, talk to her family members and explain the "abuse" Plaintiff's husband was putting her through. Gibbs told Plaintiff to be cold and distant with her husband and to absolutely not hug him, kiss him or in any way be intimate with him because then Plaintiff would start having feelings again and be subjected to his manipulation.

56.     Gibbs told Plaintiff that she needed to protect her energy, that if Plaintiff allowed him to make her emotional or upset in any way, he would use it against Plaintiff. Gibbs also stated that Plaintiff should be distant with him, refuse to go to couples therapy and tell him that she still had love for him, but that she not in love with him. Gibbs then recommended that only then she should file for divorce because if Plaintiff filed first, it would look better.

57.     On July 14, 2021, just a few days after being told by her treatment team that Plaintiff did not yet need to plan for discharge, Gibbs and her dietician told Plaintiff that she would be discharging on July 21, 2021. When Plaintiff asked Gibbs about stepping down to PHP, Gibbs said that Plaintiff did not need it. Gibbs emphasized that Plaintiff did not need the next step in the treatment process in recovery from an eating disorder because it wasn't about the food. Gibbs emphasized it was about her marriage and if Plaintiff left that she would be fine and wouldn't have the struggles she then had.

58.     Gibbs stated that if Plaintiff left her husband, her own skin wouldn't feel like a trap, she wouldn't have a desire to starve her body to silence her brain. Gibbs stated that she wouldn't be afraid of her food touching or eating before noon any longer. Gibbs' hate filled onslaught continued by stating that:

        A.     Plaintiff wouldn't be afraid of her body taking up space on this earth;

B.      Plaintiff wouldn't be afraid to eat food she used to love;

C.      Plaintiff wouldn't deprive herself of joy because food was somehow involved;

D.      Plaintiff wouldn't be afraid of feeling full so badly which made her throw up anytime she felt like that;

E.      Plaintiff wouldn't need to take handfuls of laxatives to control a number on a scale;

F.       Plaintiff would find a sense of control over an overactive brain that controlled her entire life;

G.      Plaintiff wouldn't want to go days without water because she was afraid her starving body would hold onto it; and

H.      Plaintiff wouldn't want to shrink herself to death any longer more.

59.     Gibbs stated that if Plaintiff just got a divorce, those things would no longer be a problem after 17 years. Gibbs' reprehensible legion of lies came from a person who admitted she had a darkness within her, that sometimes she just likes to hurt people and who had no experience treating eating disorders.

60.     When Plaintiff returned home, Plaintiff made sure to establish and maintain distance with her husband as Gibbs recommended. Gibbs also recommended that both Gibbs and Plaintiff should stay in touch with another patient after both discharged.

61.     On the evening of July 23, 2021, that other patient Facetimed Plaintiff while she was with Gibbs.  Gibbs and the other patient stated they were together in a bar in St, Louis having drinks and talking about Castlewood. Plaintiff, Gibbs and the other patient talked for over one hour and Gibbs told them they needed to both leave their partners and then they would all meet up in Arizona to see each other.

62.     Gibbs told Plaintiff and the other patient more about her personal life, her sex life and about her daughter and how she did not have custody of her because Gibbs threatened her daughter's step-mother and half-sister. Gibbs stated she wanted to kill the "retard" and laughed like she was joking. The half-sister of her daughter is autistic.

63.     After they left the bar, Gibbs again Facetimed Plaintiff, stated they were driving around to find food because the other patient, who had been discharged that very day was throwing up and didn't feel well. Gibbs was driving and the whole time she talked to Plaintiff about how she was put into their lives for a reason and they needed to stay close to her so they wouldn't relapse into their eating disorder. Gibbs took the just discharged, throwing up, other patient to White Castle.

64.     The following day, the other patient again Facetimed Plaintiff. The other patient was at Gibbs apartment with Gibbs and her daughter. They had made food, watched movies and talked for hours. Gibbs assured Plaintiff and the other patient that what they needed to do was to make a plan and leave their narcissist abusive partners and they could talk every day for support.

65.     After Plaintiff had spoken to her mother about the thoughts which had been implanted by Gibbs about Plaintiff's husband, Gibbs began to give Plaintiff advice on what to say to her parents and reminded Plaintiff on the "work" they had done at Castlewood. That night when Plaintiff's husband asked Plaintiff why she was being distant, Plaintiff used Gibbs words, "I have love for you, but I'm not in love with you."

66.     Thereafter until November 20, 2021, Plaintiff spoke with Gibbs on a daily basis through text messaging, TikTok messages, House party Video chat and What's App for several hours a day. Sometime in August or September, the other patient stopped

participating in the communications. When Gibbs was asked about this, Gibbs stated that she had relapsed in her eating disorder and that Plaintiff should block her.

67.     Gibbs also encouraged Plaintiff not to go to PHP, but instead to go back to work so she could have the financial means to leave her husband and to seek legal counsel. Gibbs told Plaintiff stories about her life. Gibbs disclosed her own struggles with mental health. Gibbs detailed what medications she took. Gibbs stated that she had healed all her demons and she didn't struggle anymore. Gibbs did say she had darkness within her. Gibbs would video chat with Plaintiff every day after work and many times, she would be drinking.

68.     At times, Gibbs would stay up until 3:00 a.m. and the following day, she wouldn't remember their conversations because she was drunk during them. Gibbs would openly drink alcohol and take Xanax. Gibbs expressed to Plaintiff that she had no one and if she died no one would find her body for a long time because no one checks on her.

69.     Gibbs started dating an ex-boyfriend named Nick, and she would video chat Plaintiff while Gibbs was drunk and naked with Nick and holding up her vibrator in the video. Gibbs also told Plaintiff how she didn't speak to anyone in her family and hadn't for years. Gibbs told Plaintiff she cut them out of her life because they didn't believe her trauma.

70.     Gibbs then asked Plaintiff to conduct an online search to determine if there was a warrant for her arrest. The previous night, Gibbs got drunk in a bar and when the bartender stopped serving her, Gibbs left and "keyed" the car belonging to the owner.

71.     Shortly thereafter, Plaintiff stayed with a friend for 2 weeks to "take a break from her husband." Although Plaintiff had doubts about filing for divorce, Gibbs kept encouraging her to file.   Gibbs stated she didn't understand why Plaintiff wasn't jumping

to do it. But, it had very little time since Plaintiff had left treatment, and she had already begun a relapse into her eating disorder because of the emotional/mental tug a war in which Gibbs placed Plaintiff.

72.     Plaintiff was in mental agony. And yet, Gibbs kept bolstering her self-perceived expertise by telling Plaintiff about current patients at Castlewood. Gibbs shared their names, diagnoses, ages and other personal information, and what modalities' Gibbs was using with them in therapy.

73.     Gibbs told Plaintiff that she was Plaintiff's compass, that Plaintiff needed her for direction. All the while, Plaintiff was slipping back into her eating disorder. Plaintiff was medically declining, and Gibbs kept insisting that as soon as Plaintiff leaves her husband, things will dramatically improve.

74.     Finally, Plaintiff broke down to her family and said she needed to move out of the house and leave her husband if she was ever going to get better. Plaintiff moved into her grandparents' house with her two sons the next day.

75.     Plaintiff was at a very fragile place with her eating disorder so she took a leave of absence from work and over the next month medically declined even more. Plaintiff was in the hospital several times due to medical complications from her eating disorder. Plaintiff's doctors and dietician all recommended that she seek inpatient level of care. But, Plaintiff told them she wasn't willing to go to treatment after her horrific experiences at Castlewood.

76.     Plaintiff communicated with Gibbs about her medical status and what was being recommended. Gibbs told Plaintiff that those doctors were just trying to scare her.

77.     The last time Plaintiff talked to Gibbs was on November 20, 2021. Plaintiff told Gibbs she was in the hospital for a bowel obstruction. Gibbs did not respond. Finally,

Plaintiff blocked Gibbs' number after beginning to realize how much chaos Gibbs added to her life.

78.     Gibbs recognized that Plaintiff was in the lowest, most vulnerable place, hundreds of miles from home and her family. Plaintiff wanted help, peace and guidance. Gibbs heard the things that Plaintiff wanted for herself and manipulated Plaintiff's willingness to take direction and used her role as a therapist to assert her "power".

79.     On December 6, 2021, Plaintiff admitted to inpatient eating disorder treatment where she was placed with an NG tube for 5 weeks. Plaintiff ultimately left that treatment because even after 6 weeks of being there, Plaintiff was having a lot of transference and could not separate her experience with Castlewood and the new treatment facility. Plaintiff believed that they would manipulate her like Plaintiff had been manipulated at Castlewood. Plaintiff could not engage in this life saving treatment because of the damage Gibbs caused her.

<u>Gibbs Mental Health and Self Loathing</u>

80.     Castlewood employed Gibbs to serve as a therapist in or about May 2021. However, Gibbs does not have a license as Social Worker, Professional Counselor, Occupational Therapist or any other profession. And yet, Castlewood allowed Gibbs to have access to, and provide individual counseling to patients, including Plaintiff.

81.     Upon information and belief, Castlewood did so without performing any substantive background check on Gibbs. Had they simply searched Gibbs' public and readily accessible social media postings, they would have discovered a series of disturbing blog articles written by Gibbs on her then Twitter feed[5].

---

[5] Notwithstanding the fact that the undersigned: (1) notified Castlewood of the above-referenced statements, his representation of Plaintiff, and his intention to file suit; and (2) demanded that Castlewood

82.     The content of those articles is deeply disturbing, especially in light of the fact that Castlewood subsequently placed Gibbs, with little or no supervision, in a vital and authoritative position of trust with the most vulnerable of all populations of patients. Gibbs' now deleted articles included the following statements:

"Fuck love. Love hurts. Get a hobby."

"I reflected and realized I hurt others on purpose because it makes me feel good." ... "There's a darkness in me ..."

"I can be toxic to the people I love."

"I participated in the toxic behaviors I didn't know any better, and sometimes I knew better but did not care."

"But, some days I hate myself, and I cause hell in other people's lives."

"One day I won't say things to people strictly to hurt them."

"I became strong built from rage, and hate."

"My mother hates me." "The relationship with my mom now ... Well she lives four houses down, and cant [sic.] look at me passing by.

"I have one sibling out of 4 that [sic.] communicate [sic.] with me. Yes, that's her manipulation."

"My mom looks at me with such hatred I start to look at myself with the same view."

"I didn't receive a call from my mother apologizing, or asking how I'm doing. She strictly cut me from her life as if I was the umbilical cord."

---

and Gibbs take steps to preserve all evidence that could potentially be pertinent to Plaintiff's claims, Gibbs' Tik-Tok and Twitter accounts subsequently disappeared.

"That my lady is savage, and I commend you because you won this game of cruelty mom."

83.     The American Psychiatric Association defines "*antisocial personality disorder*" as, "the presence of a chronic and pervasive disposition to disregard and violate the rights of others. Manifestations include repeated violations of the law, exploitation of others, deceitfulness, impulsivity, aggressiveness, reckless disregard for the safety of self and others, and irresponsibility, accompanied by lack of guilt, remorse, and empathy. The disorder has been known by various names, including dissocial personality, psychopathic personality, and sociopathic personality. It is among the most heavily researched of the personality disorders and the most difficult to treat. It is included in both *DSM–IV– TR* and *DSM–5*."

84.     The public generally refers to a person who demonstrates these qualities as a "sociopath." Gibbs is the quintessential embodiment of that definition.

85.     Had Castlewood conducted a deeper investigation, it would have discovered that Gibbs had lost custody of her child due to mental health issues and that she had been fired from previous employment.

86.     For reasons unknown to Plaintiff, Castlewood allowed Gibbs to lead individual therapy with Plaintiff before Gibbs had received her professional license and before she completed her alleged training.

87.     During these so-called therapy sessions, Gibbs admitted to Plaintiff and other persons that she wasn't familiar with basic "treatment" modalities that Castlewood represents its therapists use. She further admitted that she hadn't had any eating disorder training, that she had just started working at Castlewood and that she wasn't licensed.

88.     The "therapy" Gibbs provided Plaintiff included showing her videos Gibbs had seen on TikTok. Gibbs even showed Plaintiff her personal TikTok posts. Gibbs advised Plaintiff that no one would know if she (Plaintiff) "followed" Gibbs, but that she (Gibbs) wouldn't "follow" Plaintiff back while she was still a patient in case someone was able to see that and get her in trouble.

89.     Gibbs further stated that she thought Castlewood's program was "horrible" and that she was only planning to be there to get the hours needed for her license and try to make some changes to the program and then she would leave.

90.     Gibbs talked negatively about other clinicians at Castlewood and disclosed details about their personal lives and why Gibbs believed they act the way they do, and that Plaintiff and others shouldn't trust them.

91.     Gibbs further stated that she reads books and does research to try to find ways to have power over people, how she had figured out everyone else who works at Castlewood and how she can manipulate them into doing what she wants. She even went so far as to say she wouldn't send her own daughter to Castlewood if she needed help.

92.     Gibbs also stated that she just wished she could be friends with Plaintiff outside of therapy. Gibbs stated that she doesn't follow all of the rules and she still talks to some of the kids that she worked with from her previous job. Gibbs told Plaintiff and others to lie and say that Plaintiff could get her phone at night for spiritual reasons because if Plaintiff said that then she would be allowed to have it when other patients weren't. Gibbs confirmed that she could find ways around anything.

93.     On November 23, 2021, Plaintiff's counsel contacted attorneys then representing Castlewood in another matter being brought by a former patient of Castlewood who was

also represented by Plaintiff's counsel. This communication warned Castlewood of Gibbs' character and demanded that they preserve all possible evidence.

94.     Castlewood's then counsel represented that the correspondence had been sent to Castlewood. After that correspondence was received by Castlewood, Gibbs deleted her TikTok Account. And despite a demand that Gibbs cease all communications with Plaintiff's counsel's clients, the very next day, Gibbs attempted on two occasions to contact Plaintiff. A second letter was then sent to Castlewood through counsel informing Castlewood that their employee was continuing with her behavior.

95.     On Friday, December 17, 2021, Plaintiff's counsel discovered that despite having actual knowledge of Gibbs' predatory nature, Castlewood stood behind and supported Gibbs by retaining her as an employee. A predator employee conducting group sessions. A predator employee conducting individual sessions. A predator employee with access to persons suffering from the mental illness with the second highest mortality rate among all mental illnesses.

96.     Plaintiff's claims against Gibbs resulted in the discovery of an avalanche of additional issues and reprehensible conduct perpetrated by other Castlewood employees. On January 26, 2022, Gayle Devin, the current CEO of Castlewood issued a press release admitting that Castlewood "recently learned that … direct care employees might have been involved in inappropriate conduct involving a client receiving outpatient care at our St. Louis program. Based on our initial review, the allegations involve significant violations of company policy, and we have taken immediate action, including terminating employees and removing employees who remain under investigation from any client setting."

97.    Plaintiff discovered that some websites alleged as many as four (4) additional employees besides Gibbs are involved with patients alleging illegal drug use, alcohol use, sexual activity and other improper and unethical fraternization.

98.    Gibbs is simply one of the latest chapters in what has been the sordid and shameful history of Castlewood. This history includes, but is not limited to:

- A series of lawsuits brought by Lisa Nasseff and others against Castlewood and its founder, Schwartz accusing Schwartz of implanting false memories of sexual abuse, satanic cult activity, brainwashing and hypnosis that ultimately led to the resignations of Schwartz and Galperin.

- Accusations of Castlewood having violated the Americans with Disabilities Act brought by a woman who had a serious eating disorder, who allegedly was promised, but ultimately denied admission because she was HIV+ - claims that were successfully prosecuted by the United States Justice Department.

- The Missouri Committee of Psychologists 2017 censure of Schwartz after a patient complained in 2013 about a lack of supervision at Castlewood, the investigation into which revealed that while Schwartz and Galperin were directors at the Masters and Johnson Trauma units at Two Rivers Psychiatric Hospital in Kansas City and also at River Oaks Hospital in New Orleans, lawsuits were filed against these hospitals for implanting memories of multiple personality and satanic ritual abuse;

- Castlewood's hiring in April 2013 of Nicole Siegfried, who, for at least the nine (9) months prior to her being hired, had been investigated by the Alabama Board of Examiners in Psychology and placed on probation and

practice supervision for one year for ... "failure to document professional work and maintain records and engaging in a multiple relationship, patient harm and exploitive relationship;"

- Accusations by a current Castlewood employee in July 2021, that: "Leadership is very inexperienced. Due to high turnorver [sic.] and dificulty [sic.] with finding qualified applicants in the surrounding area, there have been quite a few internal transitions that are not effective. Newly licensed individuals can/have become part of leadership or promoted within leadership without leadership experience! Those with lesser experience do not feel confident in receiving feedback from those who, frankly. barely know what they are doing themselves. There is a push toward only one or two modalities of treatment (IFS and attachment theory), with little insight or training to other effective modalities. There is also very little understanding of the impact of comorbid or co-occuring diagnosis on eating disorders, thereby lessining [sic.] the effectiveness of the treatment;

- Blatant misrepresentations regarding its treatment protocol and the efficacy of the treatment afforded, specifically that its treatment regimens are "evidenced based", when, in truth, they are anything but;

- In January 2021, being sued for violating HIPAA laws;

- Creating and fostering a racially hostile environment in which African American patients are denigrated.

99.    Gibbs' reprehensible conduct which proximately caused Plaintiff's damages was not just foreseeable but inevitable since Castlewood operates its facilities in a manner that

is designed to maximize profits at the expense of providing quality mental health treatment and ensuring the safety of those entrusted to their care.

### Causes of Action as to Gibbs

### Count One

### Intentional Infliction of Emotional Distress

100.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 99, as if fully set forth herein.

101.    Gibbs, as an alleged therapist providing therapy and counseling occupied a special place of trust and confidence and owed to Plaintiff a fiduciary duty and a high place of trust.  However, Gibbs breached her fiduciary duties and intentionally inflicted emotional distress upon Plaintiff.

102.    Gibbs' above-mentioned conduct was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, was atrocious, and utterly intolerable in a civilized community.  In a horrific attempt to assuage her own demons, insecurities and self-loathing, Gibbs hunted for future victims onto whom she could transfer her own rage and hatred. With malice aforethought, Gibbs sought to hurt Plaintiff in the worst possible manner … by destroying Plaintiff and Plaintiff's family.

103.    Gibbs knew that Plaintiff was particularly susceptible to emotional distress. As such, Gibbs knew or should have known that her conduct involved an unreasonable risk of causing the injuries and damages sustained by Plaintiff.

104.    As a proximate result of the foregoing intentional wrongful acts of Gibbs, Plaintiff suffered and will continue to suffer medically significant damages as well as both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described

hereinabove. Plaintiff's damages exceed the minimum jurisdictional limits of this Court for which Plaintiff herein sues.

105.    Gibbs' conduct clearly evidences an evil motive or reckless indifference or Gibbs' conduct was outrageous. Gibbs intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Gibbs' conduct justifies an award of punitive damages in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Two

## Negligent Infliction of Emotional Distress

106.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 99, as if fully set forth herein.

107.    Gibbs had a duty to Plaintiff to exercise the highest degree of care for Plaintiff's health, welfare and safety. Gibbs, as an alleged therapist providing therapy and counseling to Plaintiff, occupied a special place of trust and confidence and owed to Plaintiff a fiduciary duty to only act in Plaintiff's best interest. Despite having this knowledge and duty, Gibbs negligently inflicted emotional distress upon Plaintiff.

108.    As an alleged therapist, Gibbs, had the duty to not only not inflict injury upon Plaintiff, but also to protect Plaintiff from injury. Gibbs intentionally and/or negligently violated her duty to Plaintiff through her actions set forth in the above-referenced paragraphs.

109.    Gibbs knew that Plaintiff was particularly susceptible to emotional distress. As such, Gibbs knew or should have known that her conduct involved an unreasonable risk of causing the injuries and damages sustained by Plaintiff. In a horrific attempt to assuage Gibbs of her own demons, insecurities and self-loathing, Gibbs hunted for future victims

onto whom she could transfer her rage and hatred. With malice aforethought, Gibbs sought to hurt Plaintiff in the worst possible manner ... by destroying Plaintiff and Plaintiff's family. Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant.

110.    As a proximate result of the foregoing intentional wrongful acts of Gibbs, Plaintiff suffered and will continue to suffer medically significant damages as well as both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages exceed the minimum jurisdictional limits of this Court for which Plaintiff herein sues.

111.    Gibbs' conduct clearly evidences an evil motive or reckless indifference or that Gibbs' conduct was outrageous. Gibbs intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of Plaintiff. Accordingly, Gibbs' conduct justifies an award of punitive damages against Gibbs in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Three

## Negligence

112.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 99, as if fully set forth herein.

113.    Gibbs, as an alleged therapist providing therapy and counseling occupied a special place of trust and confidence and owed to Plaintiff a fiduciary duty and as high place of trust.  Despite having this knowledge, Gibbs, breached her fiduciary duties and violated

her duty to exercise reasonable care towards Plaintiff as set forth in the above referenced paragraphs.

114.    Gibbs knew that Plaintiff was particularly susceptible to emotional distress. As such, Gibbs knew or should have known that her conduct involved an unreasonable risk of causing the injuries and damages sustained by Plaintiff. In a horrific attempt to assuage Gibbs of her own demons, insecurities and self-loathing, Gibbs hunted for future victims onto whom she could transfer her rage and hatred. With malice aforethought, Gibbs sought to hurt Plaintiff in the worst possible manner ... by destroying Plaintiff and Plaintiff's family. Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant. In addition, Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant.

115.    As a proximate result of Gibbs' alleged foregoing wrongful acts, Plaintiff suffered and will continue to suffer medically significant damages as well as both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages exceed the minimum jurisdictional limits of this Court for which Plaintiff herein sues.

116.    Gibbs conduct clearly evidence an evil motive or reckless indifference or Gibbs' conduct was outrageous. Gibbs intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Gibbs' conduct justifies an award of punitive damages against Gibbs in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**<u>Count Four</u>**

## **Recklessness**

117.     Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 62, as if fully set forth herein.

118.     Plaintiff brings this claim against Gibbs under a recklessness cause of action. Recklessness is a separate cause of action from negligence and does not require a finding of negligent conduct. Under a recklessness theory, a plaintiff need only prove that a defendant's conduct is in reckless disregard of the safety of another; if she intentionally does an act or fails to do an act which it is her duty to the other to do, knowing or having reason to know of facts which would lead a reasonable person to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result.

119.     Gibbs as an alleged therapist providing services occupied a special place of trust and confidence and owed to Plaintiff a fiduciary duty and a high place of trust.  Despite having this knowledge, Gibbs was reckless in her conduct and actions.

120.     Gibbs knew that Plaintiff was particularly susceptible to emotional distress. As such, Gibbs knew or should have known that her conduct involved an unreasonable risk of causing the injuries and damages sustained by Plaintiff. In a horrific attempt to assuage Gibbs of her own demons, insecurities and self-loathing, Gibbs hunted for future victims onto whom she could transfer her rage and hatred. With malice aforethought, Gibbs sought to hurt Plaintiff in the worst possible manner ... by destroying Plaintiff and Plaintiff's family. Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant. In addition, Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant.

121.    As a proximate result of Gibbs' foregoing wrongful acts, Plaintiff suffered and will continue to suffer medically significant damages as well as both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages exceed the minimum jurisdictional limits of this Court for which Plaintiff herein sues.

122.    Gibbs conduct clearly evidences an evil motive or reckless indifference or Gibbs' conduct was outrageous. Gibbs intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of Plaintiff. Accordingly, Gibbs' conduct justifies an award of punitive damages against Gibbs in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Causes of Action as to Castlewood

## Count One

## Negligent Hiring

123.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 99, as if fully set forth herein.

124.    Castlewood was negligent in hiring Gibbs.

125.    Prior to offering employment to Gibbs, Castlewood had the duty to conduct a due diligence investigation into Gibbs' background and personal history. Had Castlewood conducted even the most rudimentary due diligence, such as searching Gibbs' social media posts, Castlewood would have discovered that:

A.     Gibbs lost custody of her own biological child because of Gibbs' emotional and mental instability;

B.     Gibbs published articles expressing her hatred for her mother;

C.     Gibbs published articles stating that she liked to sometimes hurt people because it made her feel good;

D.     Gibbs published articles indicating that she participated in toxic behaviors because she didn't know any better, and sometimes she knew better but did not care;

E.     Gibbs published articles indicating that, "... some days I hate myself, and I cause hell in other people's lives."

F.     Gibbs published articles indicating that she did not believe in love, that people should get a hobby instead.

G.     Gibbs was fired from previous employment.

126.    As such, Castlewood knew, or should have known of Gibbs' dangerous proclivities. However, upon information and belief, Castlewood chose to conduct no effective due diligence. To obtain the information set forth in the prior paragraph, Castlewood only needed to conduct a google search utilizing the term, "Brittney Gibbs social media." This search would have disclosed Gibbs' Twitter account which contained the offending and offensive articles. Instead, Castlewood decided to employ a predator and let loose this predator on her victims, including, but not limited to, Plaintiff.

127.    As a proximate result of the foregoing wrongful acts of Castlewood, Plaintiff suffered and will continue to suffer both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health

issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages are in excess of the jurisdictional limits of this Court for which Plaintiff herein sues.

128.    Castlewood's conduct clearly evidences an evil motive or reckless indifference or Castlewood's conduct was outrageous. Castlewood intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of Plaintiff. Accordingly, Castlewood's conduct justifies an award of punitive damages against Castlewood in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Two

## Negligent Training

129.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 99, as if fully set forth herein.

130.    Castlewood was negligent in its training, if any, of Gibbs.

131.    Castlewood owed the general public, particularly the patients who are admitted to Castlewood and their families, including, but not limited to, Plaintiff, the highest duty to properly train its employees in all aspects of providing the most effective, evidence-based treatments of eating disorders and its many co-occurring illnesses. Since eating disorders are one of the more complex mental illnesses, therapists must have a thorough understanding, and working knowledge of the biological and psychological aspects of this illness.

132.    Castlewood failed to train its employees, including, but not limited to, Gibbs in that:

(1).     Castlewood did not conduct training sessions on the various, evidence-based treatments of eating disorders, which such training has been vetted, approved and implemented by reputable eating disorder professionals, organizations or agencies;

(2).     Castlewood, at most, trains its employees only on its own treatment protocols, protocols which have not been researched, studied, approved or adopted by any reputable, third party;

(3).     Castlewood does not utilize nor require its employees to engage in role playing methods of assessment during whatever alleged training it purportedly gives to its employees;

(4).     Castlewood does not adhere to any generally acceptable or recommended standards of training set forth by the American Psychiatric Association or American Psychology Association;

(5).     Castlewood does not educate its therapists on safe boundaries with patients or the manner in which to best serve their patients' complex needs.

133.    Castlewood does not train its counselors, therapists, direct care personnel, nurses, medical personnel or mental health personnel in generally accepted treatment guidelines and standards utilized by eating disorder professionals.

134.    Because Castlewood does not adequately train its employees, Plaintiff suffered and will continue to suffer both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages are in excess of the jurisdictional limits of this Court for which Plaintiff herein sues.

135.    Castlewood's conduct clearly evidences an evil motive or reckless indifference or Castlewood's conduct was outrageous. Castlewood placed its emphasis on generation of

profits for its private equity owner. Castlewood compromised treatment standards and misrepresented both its treatment protocols and the efficacy of those protocols. Castlewood intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of Plaintiff. Accordingly, Castlewood's conduct justifies an award of punitive damages against Castlewood in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Three

## Negligent Supervision

136.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 99, as if fully set forth herein.

137.    Castlewood was negligent in supervising Gibbs.

138.    In general, Missouri courts hold that negligent supervision cases involve situations where a plaintiff and defendant have some prior relationship.

139.    Plaintiff and Castlewood clearly had a relationship. In fact, Castlewood had a high duty of good faith to Plaintiff and was required to place Plaintiff's needs above its own.  In addition, Plaintiff and Castlewood had a contractual relationship in which Plaintiff paid good and valuable consideration for the alleged services rendered to Plaintiff.  Castlewood further made representations not just to Plaintiff but to the general public, that the services it allegedly provided constituted a gold standard and were superior to the services being offered by other treatment centers for the treatment of eating disorders.

140.    Castlewood knew that it was contracting with and providing alleged services to persons suffering from a mental illness with the second highest mortality rate amongst all mental illnesses. As such, it had the duty to provide a safe, consistent treatment

environment conducive to starting the recovery process from eating disorders and to properly supervise its employees to require them to hold to that standard at all times.

141.    Castlewood clearly had the duty to not expose Plaintiff nor its patient population to a reprehensible predator. Castlewood violated that duty by employing as a therapist, a person suffering from anti-social personality disorder. Similarly, Castlewood's lack of supervision was so lax, that is if it wasn't' non-existent entirely, resulted in its CEO admitting that it was investigating other employees for abusive conduct.

142.    Because Castlewood does not adequately supervise its employees, Plaintiff suffered and will continue to suffer both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages are in excess of the minimum jurisdictional limits of this Court for which Plaintiff herein sues.

143.    Castlewood's conduct clearly evidence an evil motive or reckless indifference or Castlewood's conduct was outrageous. Castlewood intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of Plaintiff. Accordingly, Castlewood's conduct justifies an award of punitive damages against Castlewood in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Four

## Violation of the Business Premises Safety Act

144.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 99, as if fully set forth herein.

145.    Castlewood is liable for its violations of RSMo. § 537.787, the Business Premises Safety Act.

146.    Castlewood knew or had reason to know that its employees were committing harmful acts at its St. Louis operations and had sufficient time to prevent on-going harmful acts.

147.    In a premises liability claims, when the plaintiff is an invitee, a possessor of land is subject to liability if it:

A.      Knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to invitees;

B.      Should expect that invitees will not discover or realize the danger or will fail to protect themselves against it, and;

C.      Fails to exercise reasonable care to protect them against the danger.

148.    Castlewood not only had actual knowledge of but created and facilitated a dangerous condition on its property, to wit:  allowing predators, including inexperienced, untrained and inappropriate employees to have access to patients.  Castlewood's creation of the dangerous condition included, but is not limited to, the following acts and/or omissions:

A.      not allocating sufficient financial resources to investigate, hire and train competent, professional mental health providers;

B.      hiring a person with anti-social personality disorder to act in the role of a trusted counselor;

C.      failing to investigate Gibbs before employing her in the role of a trusted counselor;

D.      failing to adequately train Gibbs;

E.      failing to properly supervise Gibbs;

F.     failing to provide a safe environment where Plaintiff would be free from abuse and the actions of predators;

G.     failing to protect Plaintiff from harmful predators like Gibbs.

149.   As a direct and proximate result of Castlewood's conduct, Plaintiff suffered and will continue to suffer both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as described hereinabove. Plaintiff's damages are in excess of the minimum jurisdictional limits of this Court for which Plaintiff herein sues.

150.   Castlewood's conduct evidences an evil motive or reckless indifference or that Castlewood's conduct was outrageous. Castlewood intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Castlewood's conduct justifies an award of punitive damages against Castlewood in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Count Five

## Fraud By Non-Disclosure

151.   Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 99, as if fully set forth herein.

152.   On January 3, 2017, Riverside acquired Castlewood from its former private equity owner, Trinity Hunt Partners. As previously noted, Castlewood at that time was, and remains, a deeply troubled institution.

153.   To attempt to separate itself from its troubling past issues, Castlewood changed its name to Alsana. Castlewood Treatment Center, LLC filed and registered the fictitious name, Alsana with the Missouri Secretary of State on March 28, 2019.

154.    To further cover up its past, Castlewood changed all Castlewood references on the internet to "Alsana." This was done with the intent of making Alsana appear to be a reputable treatment center which had been in operation for several decades. Castlewood altered hundreds of press releases on Castlewood's website. These press releases constitute and establish a pattern of false statements pertaining to health care matters and were made with the intent to defraud Plaintiff, and other third parties. Some of these releases are as follows:

| Date Of Press Release | Substance of Misrepresentation |
|---|---|
| June 17, 2010 | This Sunday June 13th, Alsana II opened for business. The new facility is only a few miles away from the current Alsana in Ballwin, Mo. The Alsana staff admitted 7 new clients.  The new facility is gorgeous, with plenty of space to grow and expand. We are so very excited about this new program and the opportunities it will provide to help even more clients. |
| Dec. 02, 2010 | Alsana Treatment Center's new Step-Down facility with conference center is almost complete! We plan to have it up and running in February 2012. We are so excited to have a new facility to house those participating in our Step-Down program |
| August 12, 2011 | We are THRILLED to announce that the Commission on Accreditation of Rehabilitation Facilities (CARF) just awarded Alsana Treatment Center a 3 year full accreditation for all service levels of care (Residential, Partial Hospitalization, Day Treatment, and IOP). This achievement is an indication of the our organizations dedication and commitment to improving the quality of the lives of individuals receiving services from Alsana. ... <br><br> Choosing Alsana Treatment Center as a CARF accredited treatment program means we have passed an in-depth review by CARF specialists of our services, staff, as well as policies and procedures. These reviews occur every 3 years and ensure that Alsana Treatment Center is complying with all CARF guidelines and continuing to provide exceptional treatment services. <br><br> All of Alsana's treatment programs and levels of care have demonstrated that we meet internationally recognized standards and that Alsana Treatment Center has made a commitment to continually enhance the quality of its programs as well as to enhance the lives of the client's we serve. |
| April 6, 2012 | Alsana Treatment Center is proud to announce that our new Step- Down House is open for residents!! This new residence is available for those |

| | |
|---|---|
| | clients participating in either our Day Treatment or our Step Down PHP programs.  Current clients moved into the new facility and are enjoying the brand new bedrooms, community space and ambiance that only Alsana can provide. |
| May 14, 2012 | We are pleased to announce the opening of our new IOP office and support group center. As of July 2012, The Eating Disorder Center of Missouri will now be located at 1859 Intertech Drive in Fenton, Missouri.  This new 6,000 square foot facility will feature four large group meeting rooms, a state-of –the art kitchen and dining room and multiple offices for therapists, dieticians and staff. |
| February 7, 2013 | Alsana statement on the recent Justice Department settlement: Alsana's sole intent in this matter was to assure optimal patient care. After evaluating all pertinent factors Alsana's professional staff concluded that the prospective patient would receive more appropriate care at an in-patient facility. Alsana has always and continues to put the interests of those seeking treatment above everything else and does not discriminate in patient care. |
| December 21, 2012 | Alsana Treatment Center for Eating Disorders is proud to announce our expansion to Monterey, California.<br><br>Alsana plans to open its third residential treatment center devoted to the comprehensive treatment of those who suffer with eating disorders. |
| December 2012 | 2012 was a year of continued growth and success for Alsana Treatment Centers.  We have maintained the excellence in services we provide while at the same time expanding our properties.<br><br>• Opened a Day Treatment House on the campus of Alsana II that sleeps 8 clients at no charge.<br><br>• Moved into a brand new, larger building for our Intensive Outpatient Program – the Eating Disorder Center of Missouri<br><br>• Established a comprehensive monitoring program for clients after discharge for up to six months with our new alumni coordinator, Nancy Finefield, MA.<br><br>• New exclusive alumni website to cater to our alumni community by providing resources and support.<br><br>• Implemented an improved discharge planning program that provides additional support for clients and is responsive to professionals' needs.<br><br>• Strong presence at many national conferences, including IAEDP, BEDA , EDRS, ICED, EDCT, APTED, ISSTD, ANAD and IFS.<br><br>• Shared our expertise by providing speakers at multiple local and national conferences. |

|  | |
|---|---|
|  | <ul><li>Hosted six rewarding Family Weeks for our clients and their support networks. The opportunity to witness the therapy and healing that occurred was astonishing.</li></ul><ul><li>Hosted three successful Preferred Provider Conferences boasting over 200 total attendees. Referring clinicians shared that these workshops were of the highest caliber, and they left with comprehensive training in the treatment of eating disorders.</li></ul><ul><li>Hosted <u>Breakfast Workshops</u> across the country to provide quality continuing education to providers.<ul><li>Nashville, TN</li><li>Columbia, MO</li><li>Kansas City, MO</li><li>San Jose, CA</li><li>Sacramento, CA</li><li>Santa Barbara, CA</li></ul></li></ul><ul><li>Hosted various one or two day long conferences to provide in depth training to clinicians.<ul><li>Orlando, FL</li><li>New York, NY</li><li>Monterey, CA</li><li>San Diego, CA</li></ul></li></ul><ul><li>Hosted two nationally recognized speakers at Alsana for continuing education for the surrounding community and our staff.<ul><li>Dr. John Allen</li><li>Dr. Patricia Crittenden</li></ul></li></ul>Overall this year, we, at Alsana, have continued our pursuit of excellence in the treatment of Eating Disorders.  We are always striving to provide additional services to meet the needs of the clients we serve. We look forward to 2013, serving our clients and their families, and enhancing relationships with the community and providers. |
| February 25, 2013 | Several top universities have partnered with <u>Alsana Treatment Center</u> this winter to provide continuing education to Counseling and Psychological Services staff members. Our clinicians work to provide information on ways to identify and assess for eating disorder behaviors, treatment options, ways to help motivate students toward change, and ideas for prevention on campus. |
| April 19, 2013 | This month <u>Alsana Treatment Center for eating disorders</u> celebrates its 13th Anniversary. Nancy Albus, Alsana CEO shared "although much has changed since Alsana first opened its doors: new faces, new buildings, additions to the clinical program, much has stayed the same, such as the strong therapeutic environment. We celebrate Alsana's anniversary this April and will continue to grow and improve our treatment and services in |

| | |
|---|---|
| | order to pursue our vision to be a national center of excellence that helps foster recovery. |
| August 14, 2013 | Alsana Treatment Center is the first facility to be awarded a three-year accreditation for eating disorders from the Commission on Accreditation of Rehabilitation Facilities.<br><br>This accreditation is the highest level of accreditation a service provider can receive. |
| August 12, 2013 | On Aug. 12, the Alsana Treatment Center for Eating Disorders announced the opening its newest facility, Highlands Treatment Center, in Birmingham, Ala. This new facility will offer clients a safe haven for healing under the leadership of Ronda Cannon.<br><br>Highlands will offer partial hospitalization programs and intensive outpatient that will be accessible to both men and women, ages 18 and older for not only all types of eating disorders, but also co-occurring issues. "We are grateful to bring our state-of-the art, individualized treatment approach to more people in need with this new facility," said Nancy Albus, CEO of Alsana Treatment Center. |
| Sept. 12, 2013 | <u>Nancy Albus</u>, Executive Director and CEO of Alsana Treatment Center for Eating Disorders in Ballwin, Missouri is featured in the September 2013 St Louis Health and Wellness Magazine.<br><br>The magazine, which focuses primarily on promoting health and wellness services and products in the local community, describes Albus's journey from stay at home mom to career woman. [Albus was never the CEO of "Alsana Treatment Center.] |
| Nov. 28, 2013 | At Alsana, we believe that <u>the process of assessment</u> is so incredibly important, because it helps us develop effective treatment programs for our clients.<br><br>When a client arrives at our facility, we conduct various initial assessments of their needs and their physical and mental state. This deepens our information and ideas about the client and their history and allows us to integrate that into an effective treatment plan for that person.<br><br>Once we have begun the treatment plan, we continue to do ongoing assessments, which allow us to see from the initial baseline how the client is improving and progressing. This also helps us determine what adaptations need to occur in the treatment plan in order to achieve the results we want.<br><br>At discharge, we want to know that the client has improved. Our final assessments allow us to evaluate our program and help us determine areas in which we need to become more effective. These assessments and outcome measures – along with a research team that stays up-to-date on |

| | |
|---|---|
| | the latest information from the treatment community – helps Alsana provide the best care to clients. |
| Dec. 20. 2013 | Alsana Treatment Center provides a safe, judgment free environment for healing where clients can address their underlying symptoms with our caring, experienced staff. We are proud of our success and even more proud of our alumni who have gone on to leader fuller lives. Here's just a sampling of what's being said by our alumni, families and professional colleagues about the Alsana experience: |

155.    The blog section on "Alsana's website" lists 49 pages, with 12 articles on each page which laud the alleged work performed by "Alsana." **These articles go back to 2011, 8 years before Alsana's Fictitious Name Certificate was filed**. *See,* https://www.alsana.com/blog/

156.    Castlewood's name does not appear on any of the 588 articles.

157.    In addition, months before the Alsana fictitious name was registered, a number of Castlewood employees appeared in videos broadcast on the YouTube platform espousing the merits and qualities of Alsana, an entity which then did not exist. These communications were made with the intent to defraud Plaintiff, and other third parties. These videos include, but are not limited to, the following:

| Date | Description of Video | Identity of Person and Job Title |
|---|---|---|
| Dec. 3, 2018 | Facebook video on Adaptive Care Model ("ACM") | Moreen Rubin, Senior Director of Clinical Services |
| Feb. 1, 2019 | Youtube video released about ACM | Nicole Siegfried, Then Chief Clinical Officer of Castlewood |
| Feb. 1, 2019 | YouTube video on ACM | Tammy Beasley, Vice President, Clinical Nutrition Services |

| Feb. 1, 2019 | YouTube video on Community of Care | Mark Eagan, M.D., Chief Psychiatric Officer |
|---|---|---|
| Feb. 1, 2019 | YouTube video on Opening Life's Doors | Mark Eagan, M.D., Chief Psychiatric Officer |
| Feb. 1, 2019 | YouTube video "Alsana is special because we treat the whole person | Tammy Beasley, Vice President, Clinical Nutrition Services |
| Feb. 1, 2019 | YouTube video, 5 components of ACM | Tammy Beasley, Vice President, Clinical Nutrition Services |
| Feb. 1, 2019 | YouTube, program embraces a wider range of parts of wellness | Nicole Siegfried, Chief Clinical Officer |
| Feb. 1, 2019 | YouTube, our program and the brain | Nicole Siegfried, Chief Clinical Officer |
| Feb. 1, 2019 | YouTube, data driven approach | Nicole Siegfried, Chief Clinical Office |
| Feb. 1, 2019 | YouTube, Your healing transformation | Moreen Rubin, Senior Director of Clinical Services |
| Feb. 1, 2019 | YouTube, Your eating disorder recovery | Lyn Goldring, BN RN CEDRN, Chief Nursing Officer |
| Feb. 1, 2019 | YouTube, Alsana means Total Health and Wellness ... "we took excruciating time and detail developing this program" | Jennifer Crute Steiner, Chief Executive Officer |
| Feb. 1, 2019 | YouTube, ACM praise I, | Brian Cook, PhD, National Director of Movement and Exercise |
| Feb. 1, 2019 | YouTube, ACM praise II | Brian Cook, PhD, National Director of Movement and Exercise |

158.    Each of these videos and other conduct perpetrated by the Castlewood are designed to induce patients and their families to utilize the alleged services provided by Castlewood.

159.    On its website, Castlewood advertises that it uses "holistic, evidence-based eating disorder treatment." The purpose of this statement is to entice patients to come to its treatment facilities. But nothing could be further from the truth.

160.    Castlewood allegedly utilizes what it refers to as "Adaptive Care Model." This Model allegedly reflects its "integrative approach to eating disorder treatment. We focus on the total health and well-being of each client by empowering these areas: medical, therapeutic, nutrition, movement, and relational practices."

161.    In order to lure patients to its facilities, Castlewood represents that its "Adaptive Care Model outperforms traditional eating disorder treatment models in reducing the severity of eating disorder symptoms." However, no university based, governmental agency, third party, peer reviewed, or independent agency-based research study exists indicating that Castlewood's Adaptive Care Model is effective or appropriate in treating eating disorders. Further, the survey relied upon by Castlewood is forced upon is patient population while they are receiving treatment. If a patient does not submit her weekly survey, Castlewood withholds treatment until such time as the survey is filled out and turned in.

162.    Castlewood also allegedly uses treatment regiments known as "Internal Family Systems" ("IFS") and Dissociative Identity Disorder Therapy ("DID"). Again, no reputable residential treatment program in the United States utilizes these treatment programs.

163.    Castlewood is a five day a week residential program with little, if any, substantive treatment and counseling being rendered on the weekends. In addition, valuable time

during group sessions is squandered in each and every group as each patient is required to discuss what "their pronouns are," or engage in art therapy, or engage in other conduct not related to the care and treatment of eating disorders.

164. Castlewood discovered that it could make far greater profits for its owner by repeatedly treating patients who relapse, without being held accountable for outcomes. As such, Castlewood created an eating disorder treatment program that is outside any reasonable or logical standard of care, and which resulted in a revolving door of patients.

165. Castlewood's conduct, acts and omissions as set forth hereinabove constitute fraud by non-disclosure in that:

(a)    Castlewood deliberately failed to disclose material facts, with said facts being set forth in paragraphs 152 - 164 all of which are incorporated herein by reference;

(b)    Castlewood had a duty to disclose those material facts;

(c)    Plaintiff was ignorant of the facts and did not have an equal opportunity to discover them;

(d)    Castlewood intended Plaintiff to act or refrain from acting based on the non-disclosure; and

(e)    Castlewood relied on the non-disclosure which resulted in actual damages.

166. Castlewood, as the provider of medical and mental health treatment of eating disorders, had the legal, moral, ethical, social and fiduciary duty to Plaintiff to disclose all material facts pertaining to its operations. As such, Castlewood's acts, conduct, omissions and misrepresentations constitute fraud by non-disclosure which was the proximate and producing cause of Plaintiff's damages.

167. Castlewood's acts of fraud by non-disclosure resulted in actual and economic damages to Plaintiff for which amount Plaintiff seeks herein. Moreover, Castlewood

engaged in such conduct knowingly, willfully, maliciously and intentionally.  Therefore, Plaintiff is entitled to recover exemplary damages in an amount to be determined by the trier of fact.

## Count Six

## Intentional Infliction of Emotional Distress

168.    Plaintiff realleges and incorporates by reference the allegations in Paragraph Nos. 1 through 99 and 152 - 164, as if fully set forth herein.

169.    Castlewood had a fiduciary duty to Plaintiff to exercise the highest degree of care for the safety of Plaintiff and the other patients entrusted to its care. Castlewood knew that its patients, including Plaintiff were suffering from a mental illness that had the second highest mortality rate.

170.    Castlewood knew or should have known that federal funding for research into this illness is almost non-existent.

171.    Castlewood knew or should have known that there are biological, genetic and societal components of eating disorders which make it difficult to treat effectively.

172.    Castlewood knew or should have known that medical doctors receive very little training on eating disorders in medical schools and residency programs.

173.    Castlewood knew or should have known that different areas of the brain are impacted by eating disorders and those areas can be treated through treatments like transcranial magnetic stimulation.

174.    Castlewood knew or should have known that up to seventy percent (70%) of people who suffer from eating disorders also suffer from a co-occurring condition or illness.

175.    Castlewood knew or should have known that its patients, especially those who were receiving residential care treatment require a stable environment and interaction with

and treatment by experienced, well-trained, well-educated medical and mental health personnel.

176.    Despite having all of this knowledge, Castlewood chose to place profiteering over the needs of its patients. Castlewood treated its patients like corporate commodities instead of patients requiring the highest standard of care.

177.    Castlewood occupied a special place of trust and confidence and owed to Plaintiff the highest fiduciary duty.  And yet, Castlewood violated this duty and intentionally inflicted emotional distress upon Plaintiff.

178.    Castlewood's conduct set forth hereinabove, but not limited to paragraphs 1 – 99, and 152 - 164 was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, was atrocious, and utterly intolerable in a civilized community.  Castlewood exposed Plaintiff and others to predators, did not adequately train or supervise its employees, did not provide a safe, secure environment, misrepresented its program, the efficacy of its program, and misrepresented its very name and existence.

179.    Castlewood knew that Plaintiff was particularly susceptible to emotional distress. As such, Castlewood knew or should have known that its conduct involved an unreasonable risk of causing the injuries and damages sustained by Plaintiff. Plaintiff's damages are so severe that she requires medical and mental health treatment and as such, Plaintiff's damages are medically significant.

180.    As a proximate result of the foregoing intentional wrongful acts of Castlewood Plaintiff suffered and will continue to suffer medically significant damages as well as both mental and emotional injuries, including, but not limited to, worsening of her eating disorder, trauma and co-occurring mental health issues, humiliation, and anxiety, as

described hereinabove. Plaintiff's damages exceed the minimum jurisdictional limits of this Court for which Plaintiff herein sues.

181.     Castlewood's conduct clearly evidences an evil motive or reckless indifference or that Castlewood's conduct was outrageous. Castlewood intentionally harmed Plaintiff without just cause or acted with a deliberate and flagrant disregard for the safety of others. Accordingly, Castlewood's conduct justifies an award of punitive damages against Castlewood in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## **REQUEST FOR TRIAL BY JURY**

182.     Plaintiff hereby requests a trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendants appear and answer herein, and that upon final trial hereof, the Court and/or the trier of fact, grant the following relief:

1.     Assume jurisdiction over Plaintiff's claims;

2.     Hold that Castlewood and Gibbs, individually and jointly and severally, are liable to Plaintiff under the causes of action and theories set forth hereinabove;

3.     Hold that Plaintiff has sustained actual damages as a proximate result of Defendants' conduct;

4.     Award to Plaintiff her actual damages as a proximate result of Defendants' conduct;

5.     Award to Plaintiff's counsel all reasonable and necessary attorney's fees incurred prosecuting this action;

6.     Assess punitive damages against all Defendants in an amount to be determined by the trier of fact, and;

     7.     Award such other relief, at law or in equity, as the Court deems just and proper.

Respectfully submitted,

/s/Steven R. Dunn
Steven R. Dunn
State Bar No. 06252250
5830 Preston Fairways
Dallas, Texas 75252

Telephone (214) 769.7810
*steven@dunnlawfirm.net*

**ATTORNEYS FOR PLAINTIFF**